THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LUCIA S.,[1] ) <br> ) <br>    Plaintiff, ) <br> ) <br> v. ) <br> ) <br> FRANK BISIGNANO ) <br> Commissioner of ) <br> Social Security,[2] ) <br> ) <br>    Defendant. ) | Case No. 22 C 5656 <br><br> Magistrate Judge Laura K. McNally |

# ORDER[3]

Before the Court is Plaintiff's Lucia S.'s memorandum in support of summary judgment, asking the Court to remand the Administrative Law Judge's ("ALJ") decision denying her applications for disability benefits (Dkt. 15: Pl. Mot. in Support of Summ. J.; Dkt. 16: Pl. Mem. in Support of Summ. J: "Pl. Mem.") and Defendant's motion and brief

---

[1] The Court in this order is referring to Plaintiff by her first name and first initial of her last name in compliance with Internal Operating Procedure No. 22 of this Court.

[2] The Court substitutes Frank Bisignano for his predecessor, Leland Dudek, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[3] On November 1, 2022, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was reassigned to the magistrate judge for all proceedings, including entry of final judgment. (Dkt. 10.)

in support of summary judgment (Dkt. 19: Def. Mot. for Summ. J.; Dkt. 20: Def. Mem. in Support of Summ. J.: "Resp.")

## I. Procedural History

Plaintiff applied for supplemental security income and disability insurance benefits on March 10, 2020, alleging she became unable to work on May 25, 2018. (R. 243-55.) Her date last insured was September 30, 2020. (R. 17.) The ALJ denied Plaintiff's claims on July 27, 2020 and again on reconsideration on December 17, 2020. (R. 100, 130.) She then appeared for a telephone hearing before ALJ Bill Laskaris on January 13, 2022. (R. 54-79.) Plaintiff, who was represented by an attorney, and a vocational expert testified.

On January 28, 2022, the ALJ issued a decision finding Plaintiff not disabled, and she subsequently appealed. (R. 237-39.)[4] After considering the parties' briefs and evidence, the Court grants Plaintiff's motion for summary judgment and denies the Defendant's motion to affirm the ALJ's decision.

## II. ALJ Decision

The ALJ applied the Social Security Administration's five-step sequential evaluation process to Plaintiff's claims. At Step One, she found that Plaintiff had not engaged in substantial gainful activity since her onset date. (R. 17.) At Step Two, the

---

[4] The Appeals Council denied review of the opinion (R. 1-6), making the ALJ's decision the final decision of the Commissioner. *Bertaud v. O'Malley*, 88 F.4th 1242, 1244 (7th Cir. 2023).

ALJ determined that Plaintiff had the severe impairments of bipolar disorder, generalized anxiety disorder, depression, borderline personality disorder traits, gastritis, posttraumatic stress disorder (PTSD), post-status cerebrospinal fluid leak, obstructive sleep apnea, mood disorder not otherwise specified, somatic symptom disorder, and obesity. (*Id.*)

At Step Three, the ALJ found that none of Plaintiff's impairments met a Listing. (R. 18.) In considering Plaintiff's mental impairments, the ALJ undertook the "Paragraph B" analysis for evaluating mental limitations. (*Id.*) The ALJ determined that Plaintiff had mild limitations in understanding, remembering, and applying information and adapting and managing herself, and moderate limitations in interacting with others and concentrating, persisting, and maintaining pace. (*Id.*)

Before Step Four, the ALJ determined that Plaintiff had the following residual functional capacity:

> Medium work as defined in 20 CFR 404.1567(c) and 416.967(c) as lifting/carrying 50 pounds occasionally and 25 pounds frequently, standing/walking six of eight hours and sitting six of eight hours. However, the claimant also has the following additional limitations: frequent climbing of ladders, ropes and scaffolds, ramps and stairs; avoid concentrated exposure to pulmonary irritants such as fumes, odors, dusts and gases; avoid concentrated exposure to poorly ventilated areas; simple, routine and repetitive tasks; low stress job defined as occasional decision-making required, occasional changes in the work-setting, and no strict production rate requirements; occasional interaction with co-workers and supervisors; no public interaction; no tandem work. (R. 19.)

At Step Four the ALJ found that Plaintiff could not perform her prior job as an office clerk. (R. 22.) At Step Five, the ALJ found that other jobs existed in significant numbers in the national economy that Plaintiff could perform. (R. 23.) Therefore, the ALJ found that Plaintiff was not disabled. (*Id.*)

### III. Legal Standard

Under the Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions, known as "steps," in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform his former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 416.920(a)(4).

An affirmative answer at either Step Three or Step Five leads to a finding that the plaintiff is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step other than at Step Three precludes a finding of disability. *Id.* The plaintiff bears the burden of proof at Steps One to Four. *Id.* Once the

4

plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work that exists in significant numbers in the national economy. *Id.*

The Court does not "merely rubber stamp the ALJ's decision on judicial review." *Prill v. Kijakazi*, 23 F.4th 738, 746 (7th Cir. 2022). An ALJ's decision will be affirmed if it is supported by "substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. ALJs are "subject to only the most minimal of articulation requirements" and "need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning." *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024). "All we require is that ALJs provide an explanation for how the evidence leads to their conclusions that is sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford the appellant meaningful judicial review." *Id*. at 1054.

The Seventh Circuit added that "[a]t times, we have put this in the shorthand terms of saying an ALJ needs to provide a 'logical bridge from the evidence to his conclusion.'" *Id*. (citation omitted). The Seventh Circuit has further clarified that district courts, on review of ALJ decisions in Social Security appeals, are subject to a similar minimal articulation requirement: "A district (or magistrate) judge need only supply

5

the parties . . . with enough information to follow the material reasoning underpinning a decision." *Morales v. O'Malley*, 103 F.4th 469, 471 (7th Cir. 2024). The district court's review of the ALJ's opinion "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute its judgment for the ALJ's determination." *Chavez v. O'Malley*, 96 F.4th 1016, 1021 (7th Cir. 2024) (internal quotations omitted).

**IV. Analysis**

As relevant here, Plaintiff alleges that she is unable to work because of her various mental impairments, and she offers a host of challenges to the ALJ's conclusions. (Pl. Mem. at 5-6.) After considering Plaintiff's arguments the Court holds that the ALJ erred in his analysis of Plaintiff's somatic symptom disorder both generally and in relation to his evaluation of the opinion of Mark Amdur, M.D. In addition, the ALJ erred by failing to address problems with the vocational expert's methodology. Therefore, remand is required.

**A. Substantial Evidence Did Not Support the ALJ's Consideration of Plaintiff's Somatic Symptom Disorder.**

The ALJ found that Plaintiff had both physical and mental impairments that were severe. (R. 17.) Relevant to the Court's opinion is the ALJ's finding that one of Plaintiff's severe impairments was somatic symptom disorder (*Id.*), a mental illness

6

characterized by an extreme focus on physical symptoms that causes major emotional distress and problems functioning.[5]

Plaintiff was hospitalized because of suicidal ideation and thoughts of self-harm in August and October 2018. (R. 368-409, 806-09.) After that, she had regular appointments with a psychiatrist to manage her medications, and she also engaged in psychotherapy. (R. 2353, 4167.) During an overnight hospital stay in November 2018, Plaintiff complained of an excessive concern about her physical health. (R.1345.) In June 2020, she was formally diagnosed with somatic symptom disorder. (R. 2830.)

The 4,200-page medical record documents at least twenty emergency room or hospital admissions between November 2018 and June 2020 for various physical issues and/or mental health complaints. It also records dozens of doctors' appointments in between emergency room visits. For example, in August 2019 and June 2020, Plaintiff underwent surgical procedures to repair cerebral spinal fluid leaks from her nose. (R. 1552, 1566, 2811.) Other emergency room visits, some of which resulted in overnight stays, were for complaints that included abdominal pain, pelvic pain, diarrhea, wrist pain, a rash, nosebleeds, and shortness of breath. (*See, e.g.,* 419-607, 1316, 1431-1510.) At some of these visits, Plaintiff complained of generalized anxiety, panic attacks, nervousness around people, and anxiety related to her physical health. (*Id.,* 1345, 2824.*)*

---

[5] https://www.mayoclinic.org/diseases-conditions/somatic-symptom-disorder/diagnosis-treatment/drc-20377781 *visited on* May 18, 2025.

7

While the ALJ found that Plaintiff had severe mental impairments, he concluded that after her 2018 hospitalizations, her mental health was well-managed with medication and psychotherapy. (R. 21.) Specifically, he pointed to medical records from October 2020 and throughout 2021 that showed what the ALJ characterized as "general stability and baseline mental functioning." (*Id.*) The ALJ described various times Plaintiff reported feeling normal or in a good mood, denying suicidal ideation or anxiety, and having normal insight and judgment. (*Id.*) At the same time, the ALJ acknowledged other assessments of depressed mood, preoccupied thought content, and only partial insight. (*Id.*)

The ALJ also considered three medical opinions concerning Plaintiff's mental health: two from non-examining state agency doctors and one from Dr. Amdur, an examining medical consultant hired by Plaintiff. (R. 22.) The state agency doctors at both the initial and reconsideration levels determined that Plaintiff had no severe mental impairments. (R. 86-87, 110.) The ALJ found these opinions "generally persuasive, as they are consistent with the mental status examinations of records showing largely intact cognitive functioning." (*Id.*) To account for noted thoughts of self-harm and Plaintiff's 2018 hospitalizations, however, the ALJ determined that Plaintiff's mental impairments were in fact severe. (*Id.*) The ALJ further determined that Plaintiff was moderately limited in concentration, persistence, and pace and in her ability to interact with others. (*Id.*)

8

Dr. Amdur opined that Plaintiff had markedly severe generalized anxiety disorder that would cause her to be unable to tolerate perceived stress, and panic and agoraphobia that would make her attendance at work unreliable. (R. 4221-35.). Dr. Amdur also opined that Plaintiff's utilization of healthcare services far exceeded expected frequencies. (*Id.*) The ALJ found Dr. Amdur's opinion unpersuasive because it was not consistent with the longitudinal treatment records showing Plaintiff had only conservative treatment of medication and psychotherapy after her two 2018 hospitalizations. (R. 22.) As relevant to the decision here, the ALJ stated that he also rejected Dr. Amdur's opinion because "[n]otably, the frequency of the claimant's mental health treatment of record does not support finding that the claimant's utilization of healthcare services far exceeds expected frequencies." (*Id.*)

At first glance, it appears the ALJ adequately considered and weighed the medical evidence concerning Plaintiff's mental impairments. But on closer look, the Court finds that the ALJ did not properly account for Plaintiff's somatic symptom disorder. After finding that impairment to be severe, the ALJ had to determine whether the severity of Plaintiff's resulting symptoms limited her ability to work. "[T]his is the heart of the RFC analysis." *Swiecichowski v. Dudek*, 133 F.4th 751, 758 (7th Cir. 2025). The Court finds that the ALJ's treatment of Plaintiff's somatic symptom disorder lacked this analysis.

9

The ALJ made only two comments in consideration of Plaintiff's somatic symptom disorder. One is a mention that in October 2021, Plaintiff reported only mild anxiety surrounding her general health. (R. 21.) The second is the ALJ's determination, described above, that the frequency of claimant's mental health treatment did not support a finding that she exceeded expected utilization of the healthcare system.

It is the ALJ's second comment that drives the need to remand. The ALJ decided Plaintiff did not overutilize the healthcare system based solely on the frequency of her mental health treatment. But as Plaintiff points out, somatic symptom disorder is characterized by an unhealthy focus on physical health. (Reply at 6). The ALJ never acknowledged Plaintiff's utilization of the healthcare system for physical issues, in particular the sheer number of times Plaintiff visited the emergency department for what often appeared to be minor physical problems. Therefore, the Court does not know how the ALJ evaluated that evidence in crafting the residual functional capacity.

The ALJ's error continued in his evaluation of Dr. Amdur's opinion. Dr. Amdur was the only doctor who offered an opinion about Plaintiff somatic symptom disorder. Despite finding that disorder to be severe, the ALJ relied on his own lay view regarding healthcare utilization rates to reject Dr. Amdur's medical opinion. An ALJ is not permitted to substitute his own lay opinion on medical matters. *Engstrand v. Colvin*, 788 F.3d 655, 660–61 (7th Cir. 2015) (by incorrectly assuming a connection between observations without medical evidence, the ALJ was inappropriately "playing

10

doctor"). In this case, the ALJ "observed" Plaintiff's medical frequency and concluded that only her mental health treatment was relevant to her somatic syndrome disorder, but that observation was not grounded in substantial evidence.

Defendant counters that neither of the state agency doctors who considered Plaintiff's mental health found Plaintiff to have any severe mental health impairments. (Resp. at 7-8.). Defendant further argues that the ALJ was entitled to rely on those opinions and points out the ALJ even went further, determining that Plaintiff's mental impairments were severe. (*Id.*) It is true that there is usually no error when an ALJ determines a residual functional capacity that is more restrictive than all medical opinions. *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004), *cited in Moyer v. O'Malley*, No. 23-2599, 2024 WL 1411565, at *3 (7th Cir. Apr. 2, 2024). But in this case, there was a more restrictive opinion—Dr. Amdur's— and the ALJ erred by and rejecting it without substantial evidence.

Moreover, while both of the state agency psychological consultants opined that Plaintiff had no severe mental impairments, it is not apparent if they reviewed the bulk of Plaintiff's physical medical history or considered her somatic symptom disorder in light of that history.[6] Neither of the state agency doctors mention it in their review of Plaintiff's mental health. Given the fact that the ALJ nonetheless found Plaintiff's

---

[6] Two other state agency doctors separately evaluated Plaintiff's physical impairments. (R. 95-96, 108-09.)

11

somatic syndrome disorder to be a severe impairment, the Court is unable to trace a logical bridge from the evidence of the disorder to the ALJ's omission of it from the residual functional capacity. Therefore, it must remand the case.

**B.     The ALJ Erred in his Consideration of the Vocational Evidence.**

Plaintiff separately asserts that the Commissioner did not meet his burden at Step Five to prove there were a sufficient number of jobs in the economy that Plaintiff could perform. (Pl. Mem. at 13.) The Court agrees.

At the hearing, the vocational expert testified about three jobs that matched the hypothetical offered by the ALJ. These jobs were hand packer, assembler, and inspector. (R. 74-75.) The vocational expert provided a single Dictionary of Occupational Titles ("DOT") code number for each job (*Id.*)[7] He also provided the number of each job in the national economy. For example, the vocational expert testified that at the medium level, there would be 82,000 hand packer jobs in the national economy. (R. 74.) When the ALJ added additional limitations to the hypothetical, the vocational expert testified that there were 159,000 light hand packer

---

[7] The vocational expert offered the DOT job codes of 920.587-010 for medium level hand packer, 739.687-186 for medium level assembler, and 651.687-010 for medium level inspector. (R. 74.) When the ALJ changed the hypothetical, the vocational expert provided three more DOT codes for the same jobs at the light level. (R. 75.)

12

jobs in the national economy. (R. 75.) The vocational expert testified about the number of jobs in the national economy for the assembler and inspector jobs as well. (*Id.*)[8]

Upon questioning by Plaintiff's attorney, the vocational expert clarified that his jobs estimates were not for individual DOT codes. (*Id.*) Instead, they included the entire Occupational Employment Statistics ("OES") group each individual DOT number belonged to. (*Id.*) Upon further questioning, the vocational expert testified that there were 59 different DOT packer codes, 782 sorter and inspector codes, and 1,589 assembler codes in the relevant OES groups. (R. 76.) Later, in closing, Plaintiff's attorney noted that the jobs numbers the vocational expert offered were for entire OES groups and not individual DOT code. (R. 78.) He stated, "there are a number of different jobs in each OES group, some meet [the hypothetical], some don't." (*Id.*)

The Court acknowledges that Plaintiff did not specifically ask the vocational expert how many of individual DOT codes in each OES group met the residual functional capacity hypothetical. But it agrees that Plaintiff adequately called the vocational expert's methodology into question. The Commissioner bears the burden at Step Five of proving that sufficient jobs exist in the national economy that a claimant can perform. In this case, the vocational expert testified to the number of jobs in broad OES categories without any reassurance as to how many of those jobs would be

---

[8] The vocational expert testified there were 45,000 medium assembler jobs, 99,000 light assembler jobs, 15,000 medium inspector jobs, and 60,000 light sorter/inspector jobs in the national economy. (R. 74-75.)

13

available to Plaintiff, given her limitations. As the Court is already remanding this case for further consideration of Plaintiff's somatic symptom disorder, it further orders that on remand, the ALJ collect reliable job data for actual DOT positions.

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiff's motion to remand the ALJ's decision (Dkt. 15) and denies Defendant's motion (Dkt. 19.)

**SO ORDERED.**

        **ENTER:**

        *Laura K. McNally*

        **LAURA K. MCNALLY**
        **United States Magistrate Judge**

**DATED: May 19, 2025**